CHEHARDY, Judge.
Plaintiff Mrs. Patricia Barras instituted this suit for personal injuries she sustained while a patron at defendants’ water slide. Defendants are the slide owner and its liability insurer. The district court dismissed the suit holding that reasonable and ordinary care was exercised by the owner and the slide was reasonably safe for the use intended. Plaintiff has appealed.
The record reflects the following facts:
Mrs. Barras, a 32-year-old widow, accompanied by two friends, had gone to the Greased Lightning water slide on July 19, 1979. She had ridden down the slide seven times without mishap, but on the eighth ride she struck the bottom of the pool with such force that she allegedly fractured her coccyx and sustained low back injuries.
Plaintiff contends her injuries were caused by the defective manufacture and/or maintenance of the water slide. In support of this position she relies on the testimony of herself, the two ladies who accompanied her, a fellow employee at the slide at the time of her accident and A.J. Scardino, Jr., an expert in the field of safety and human factor engineering.
No one saw plaintiff strike the bottom of the pool, but she told them right after the event. The other ladies rode down once or twice more and then left with plaintiff. No one was injured other than plaintiff. They all testified that they estimated the distance between the end of the flume and the entrance to the water was a 1-foot drop. There was no evidence presented of any other defect.
Mr. Scardino testified he conducted a library search for standards for the water slide industry, but none existed. Therefore he resorted to a state of the art survey, personally visiting 10 to 12 water slides in this state, Mississippi and Alabama. The general concensus of the other owners/operators was that a water depth of 3 feet is best to act as a decelerant and to facilitate rapid movement and discharge people from the pool. He found a variance as to how much of the pool actually flowed into the flume, but in every slide he reviewed there was some “communication” with the pool level.
In his opinion the defendant’s pool and slide are unsafe if the water depth is not maintained properly, and based upon plaintiff’s claim that the drop from the end of the flume to the water was 1 foot on the date of the accident, the depth of the water could only have been 27 inches (as opposed to 3 feet), thus causing her to strike bottom with great force.
The witness inspected the pool in January 1980 and concluded the slide did not meet the engineer’s plans and specifications, because the distance from the flume to the water on that date was 7 inches below, and as shown on the plans it should have been 2V2 to 3 inches above, the flume. The water depth on that date was 36 inches at the deep end. It is noted that the slide was not in operation at the time of his inspection.
*1241 Defendants presented the testimony of the manufacturer, the designer, one of the corporate owners, and three employees who discussed their duties in the daily operation of the enterprise.
Lee Cox testified as an expert in the manufacture and design of water slides. He became interested in the industry in its infancy (1971) and in 1977 entered the business. He travelled all over the country visiting installations, slide manufacturers, architects, engineers and designers. Pools around the country varied in depth from 24 inches to 5 feet, however, the generally accepted standard depth is 3 feet. This insures the water is not too deep for youngsters, who are the largest group of customers, and enables the participants to get out of the water quickly.
The slides he visited had varying drop offs from the end of the flume to the water level. Disney World operates with a 4-foot drop, a Salt Lake City slide had a 4-inch drop, a Houston slide had a 6-inch drop, an Ohio slide had an 8-inch drop, and a St. Petersburg slide had at least a 1-foot drop. In his opinion a safety standard based upon a 36-inch pool with water fluctuating 3 inches below or 3 inches above that level is ideal. When the water is at that level in defendant pool the distance between the flume and the water is IV2 to 2 inches below the flume.
Arnold R. Smythe, Jr., a civil engineer, was called by Cox to draw a set of plans for the water slide. Smythe testified the recommended depth of 36 inches for water in the pool was supplied by Cox, and arrived at by consultations of both parties and by consensus with other owners. Like Cox, he visited other slide enterprises to determine the ideal differential between the top of the water at the operational level and the end of the water slide.
He also looked at the physics, i.e. the law of motion, to determine the proper dimensions, and concluded it would be better not to have the person drop any distance from the flume to the water, because if the end of the flume is several inches above the water, the downward direction of travel could plunge a person toward the bottom of the pool and cause injury. The pool was planned to have a zero differential between the flume and the water but an inch or so differential does not make a radical change in direction after the patron enters the water.
In visiting other slides to get a consensus of safe practices he measured with a stop watch the speeds of persons of different weights and sizes going down the slide since it is prudent design to have a knowledge of the speed you can reasonably expect so you can allow for a cushion.
He went to the defendant slide often, testing it before and after it was open for business and found it very satisfactory. He was satisfied the water level was adequate and that the interface between the flume and the water was fine. He is 6 feet, 4 inches tall and weighs 210 pounds, and he never hit the bottom of the pool.
John Stampley, one of the corporate owners, stated they had 800,000 customers since the slide opened and only four accident claims, other than minor bruises. One claim involved a chipped tooth, and another a laceration of the hand. He spends much time at the slide and stated the water level might be 34 inches at the beginning of the day when the slide opens, or right before closing, but if the water level were to drop below the skimmers it would lose prime and the motors would burn up.
The managers listed their duties. They check the pump house, the pool, the chlorine and water level, check the flumes for nicks or cuts and make sure the parking lot and pool area are clean so no one could cut themselves. The day manager has been a science teacher for seven years and has worked at the slide for three summers.
The night manager is a 28-year-old salesman. He confirmed the same duties at night. They have two employees stationed at the top of the slide to see the patrons do not engage in horseplay, or travel more than one at a time, and at least two or usually three employees are at the bottom of the pool to be sure the patrons get out *1242 quickly so no one is hurt when others come down the slide.
The managers always check the water levels and know, from where the water is on the line at the sides of the pool, whether more water is needed. To keep the level of the water at 36 inches they watch a tile at the bottom of a row of bricks at the top of the pool. The water level is kept at the top of the tile just below the bricks and if it drops to the middle of the tile it is time to add water. As people come in during the day the water level changes.
The day manager has no recollection as to the maximum distance from the bottom of the flume to the top of the water, but the night manager stated when the pool level was in the middle of the tile, the distance from the bottom of the flume to the top of the water was IV2 to 2 inches.
The only serious injuries they knew of was a chipped tooth, a boy who bit his tongue, and someone who injured his shoulder while engaging in horseplay. The procedure was to send the patrons to East Jefferson Hospital and the corporation paid the bill. There were very few claims.
Clearly the trial court believed from the testimony of defendant witnesses that the pool and slide were properly maintained and that the distance between the flume and the water claimed by plaintiff on the date of the accident was not substantiated.
Plaintiff complains, however, that her case was decided under C.C. art. 2315 on the theory of negligence and that it should have been decided under C.C. arts. 2317 and 2322, theories of strict liability.
We note that plaintiff petition is based upon numerous allegations of negligence, and her proof in the trial court has been to show negligence in the manufacture or maintenance of the slide. However, we do agree with her brief to the extent that common sense tells us many injuries will occur due to the hazardous nature inherent in the slide itself and that most of the risks of these hazards can be assumed by those using the slides. We might add that this should be particularly apparent to a person who has had trouble with her back since age 10, as described by her doctor; however, plaintiff contends the slide was constructed so as to increase the probability of someone being violently thrown to the bottom of the pool. As a factual matter this does not appear to be true.
We are not prepared to hold that the trial court committed error in its appreciation of the facts. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973).
In addressing plaintiffs claim under 2317, this article imposes liability on the custodian of a defective thing which creates an unreasonable risk of harm to others. According to Loescher v. Parr, 324 So.2d 441 (La.1975), the plaintiff must prove the vice (i.e. the unreasonable risk of injury to another) in the person or thing whose act causes the damage, and that the damage resulted from the vice. In both negligence and strict liability cases, the probability and magnitude of the risk is to be balanced upon the utility of the thing. The distinction between the two theories of recovery lies in the fact that the inability of the defendant to know and prevent the risk is not a defense in a strict liability case, but precludes a finding of negligence.
Unlike Loescher, the water slide was not proven defective in any way, and many thousands of patrons have used it without injury — certainly no one else in plaintiff’s party or any other patrons of the slide came forward in answer to plaintiff’s attorney’s newspaper ad who were injured that evening when the water level was allegedly far below the recommended depth. The record is devoid of any evidence posing an unreasonable risk for the purpose intended. Shipp v. City of Alexandria, 395 So.2d 727 (La.1981).
We are also cited to C.C. art. 2322, which provides:
“The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.”
*1243 It is clear plaintiff-appellant has no cause of action under this article because it did not arise from the fall or collapse of the water slide or any of its components.
The record clearly supports the trial court findings of no negligence or fault on the part of defendants and plaintiff has failed to establish any defect in the premises or the maintenance thereof so as to cause unreasonable risks or harm or injury to users of the water slide.
For the reasons assigned the judgment appealed from is affirmed.
AFFIRMED.